# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00746-COA

CALVIN RAY AULTMAN                                    APPELLANT

v.

LATRESE YEVETTE AULTMAN                               APPELLEE

DATE OF JUDGMENT:              05/29/2024
TRIAL JUDGE:                   HON. MARK ANTHONY MAPLES
COURT FROM WHICH APPEALED:     JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        G. CHARLES BORDIS IV
ATTORNEY FOR APPELLEE:         MATTHEW STEPHEN LOTT
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED IN PART; REVERSED AND
                               REMANDED IN PART - 01/13/2026
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND WEDDLE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Latrese Yevette Aultman filed for divorce on several fault-based grounds against Calvin Ray Aultman in the Jackson County Chancery Court. The parties subsequently agreed to divorce on the basis of irreconcilable differences and to leave certain issues—including equitable property distribution, alimony, and attorney's fees—to be decided by the chancery court. Calvin appeals the chancery court's September 5, 2023 "Judgment of Divorce," as amended by the May 29, 2024 "Judgment on Defendant's Motion for New Trial" (collectively, "Final Judgment"),[1] asserting that the chancery court (1) erred in its equitable

---

[1] Unless otherwise indicated, we collectively refer to the chancellor's September 5, 2023 Judgment of Divorce and May 29, 2024 Judgment as the Final Judgment.

distribution analysis by failing to properly value certain assets; (2) erred in awarding Latrese alimony based upon the chancery court's failure to properly value the marital assets in its equitable distribution analysis; and (3) erred in awarding attorney's fees to Latrese. We affirm the chancellor's Final Judgment in part, and we reverse and remand in part for the reasons detailed below.

## STATEMENT OF FACTS

¶2. Latrese and Calvin were married on August 17, 2001. They had a daughter born in January 2007. Latrese filed for divorce on the grounds of habitual cruel and inhuman treatment, abandonment, and adultery on February 2, 2022. Both parties attended a temporary hearing on March 10, 2022. The court entered a temporary order after the hearing, awarding both parties temporary use and possession of the home located at 2508 Honduras Drive, Gautier, Mississippi (Gautier home), with the admonishment that "[b]oth Parties shall not disturb the peaceful existence of each other or the children," and prohibiting each party "from harassing or interfering in any manner with the other." The order further provided that Latrese was responsible for the "house note, internet and cable bill, groceries[,] and half of the child's extracurriculars." Calvin was "responsible for timely payment of . . . all household bills for [the] family that he is currently paying."

¶3. Calvin was arrested for domestic violence (simple assault) against Latrese on May 9, 2022. That charge was later dismissed, but a "Temporary Protective Order and Writ of Assistance" was issued against Calvin on May 12, 2022, prohibiting him "from coming within 2,000 feet of [Latrese] or [the Gautier] home."

¶4.    On June 15, 2022, Latrese filed a "Complaint for Contempt" based upon Calvin's failure to pay the necessary household expenses as ordered by the chancery court. These expenses were specifically itemized in the complaint and totaled $2,743.48. The complaint also contained a request for "reasonable attorney fees." Pursuant to a temporary order entered on July 27, 2022, Latrese was instructed to present to Calvin's counsel proof of outstanding bills for payment within five days of her receipt of the bills. The record reflects that Latrese provided Calvin's attorney a copy of an insurance bill and a delinquent car note on September 21, 2022, a second notice of the car note delinquency on October 31, 2022, and another delinquent USAA insurance bill on November 10, 2022.

¶5.    Pursuant to a temporary order entered on November 16, 2022, Calvin was ordered to furnish the court with proofs of payment of the bills he was required to pay pursuant to the March 10, 2022 temporary order, and to bring current Latrese's car note and insurance. Latrese filed a "Complaint for Emergency Relief" on November 30, 2022, seeking payment of these items because "[Calvin] has continued to fail to meet his obligations" under the March 10, 2022 temporary order. In her complaint, Latrese specifically requested that a withholding order be entered "to cover the entirety of [Calvin's] monthly obligations."

¶6.    On December 2, 2022, the chancery court issued an emergency order, recognizing that Calvin had failed to pay the debts and expenses required under the March 10, 2022 temporary order. After a hearing held on December 14, 2022, the chancery court entered a second temporary order, providing that a "withholding order shall be entered effective immediately in the amount of $2,008.00 per month to cover expenses." The order specifically provided

3

that "Calvin is found in willful contempt for failure to pay items in [the March 10, 2022] temporary order. Attorney's fees and incarceration is reserved."

¶7. On June 23, 2023, Latrese and Calvin executed a "Consent to Irreconcilable Differences" consenting to an irreconcilable differences divorce and specifying that "the issues to be decided by the Court are: custody, child support, alimony, attorney's fees, equitable distribution, contempt, payment of past bills, retirement distribution." The chancery court entered an "Order Withdrawing Contested Matter," providing "[t]hat the contested issue[s] of habitual cruel and inhuman treatment, abandonment[,] and adultery" were withdrawn, and "the parties desire to seek their divorce on the grounds of IRRECONCILABLE DIFFERENCES."

¶8. On the same day, the chancellor held a hearing to address the issues identified in the parties' consent for the court to resolve. We address the testimony and exhibits relating to equitable property distribution, alimony, and attorney's fees that are the issues Calvin now raises on appeal.

¶9. The chancellor began the hearing by addressing several preliminary matters. The chancellor confirmed that the parties were married on August 17, 2001, they had been married approximately twenty years before Latrese filed for divorce in February 2022, and one female child was born of the marriage in January 2007. The chancellor also confirmed both parties had submitted updated Rule 8.05 financial declarations. *See* UCCR 8.05. The chancellor set the date of demarcation for purposes of marital property valuation as March 10, 2022, which was the date of the first temporary order in this matter.

4

¶10.    Latrese and Calvin testified at the hearing, and nineteen exhibits were received into evidence, including the parties' updated Rule 8.05 financial declarations; statements from Calvin's Chevron Employee Savings Investment Plan (ESIP); statements from Lott Law (Latrese's attorney); the warranty deed for the 2508 Honduras Drive, Gautier, Mississippi property and the September 2, 2021 appraisal of that property; and a collective exhibit containing Calvin's Form 1040 individual federal tax returns for 2020 and 2021; annual reminders from the Internal Revenue Service (IRS) concerning taxes owed from 2012, 2013, 2014, 2017 and 2018; and several statements from Calvin's Chevron Retirement Plan and Calvin's Chevron ESIP.

¶11.    Following the preliminary matters, Latrese testified.  At the time of the hearing, Latrese was fifty-four years old and employed as an administrative assistant with the Mississippi Department of Child Protection Services.  According to her Rule 8.05 financial declaration, her monthly gross income was $2,247.27, with a monthly net income of $1,455.27.  Her total living expenses and obligations were $5,408.78.  Latrese testified that she had a Public Employees' Retirement System (PERS) account that she testified was valued at "like, [$]22,000-and-something."

¶12.    Initially, Latrese filed for divorce based on habitual cruel and inhuman treatment, abandonment, and adultery grounds.  Although the parties ultimately agreed to an irreconcilable differences divorce, the chancellor allowed limited testimony regarding affairs that Latrese believed Calvin had with other women during their marriage.  The chancellor announced that some testimony on this issue would be allowed in light of the considerations

under *Ferguson*,[2] regarding equitable distribution, and *Armstrong*,[3] regarding alimony. Latrese also testified about the times she needed to request the court's assistance because Calvin was not paying the expenses he was supposed to pay pursuant to the March 10, 2022 temporary order.

¶13. Additionally, Latrese testified about the altercation between her and Calvin and the assault charge she filed in May 2022 as a result of that altercation. During her cross-examination, Latrese was shown exhibit 18, which was the court abstract from the City of Gautier municipal court concerning that case. The court abstract showed that the assault charge had been "dismissed." Latrese acknowledged that she did not know what happened to the case because it just "kept getting continued."

¶14. Latrese testified that Calvin took out loans or withdrew sums from his Chevron ESIP during their marriage, referencing records admitted into evidence as exhibits 3 and 19. These amounts include $55,000 in December 2018; $5,395.07 in September 2019; and a $100,000 withdrawal in April or June 2020. Regarding the $100,000 amount, Latrese testified that Calvin told her this withdrawal was to repay his IRS tax debt, but the debt was not paid. Another loan was taken out against Calvin's ESIP in the amount $14,758.66 in April 2021. There was a $21,356.00 withdrawal in April 2021 and a $15,624.00 withdrawal in July 2021. Latrese testified that she did not make any of these withdrawals or take out any of these loans.

---

[2] *Ferguson v. Ferguson*, 639 So. 2d 921, 928-29 (Miss. 1994).

[3] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280-81 (Miss. 1993).

¶15. Latrese also testified about the Gautier home. At the time of the hearing, Latrese and the couple's daughter were living in that home. Latrese testified that following her parents' separation, she and her mother borrowed $70,000 and paid $35,000 to Latrese's stepfather, who then conveyed his half-interest in the property to Latrese and her mother.

¶16. This transaction occurred in 2017, while Latrese and Calvin were married, and four years before the parties' separation. For four years, Calvin, Latrese, their child, and Latrese's mother lived in the Gautier home. The $35,000 balance remaining on the loan was used to renovate the home. According to Latrese, Calvin contributed $7,000 for remodeling the home's bathroom.

¶17. Latrese testified that she purchased her stepfather's interest "to get us [(Latrese, Calvin, and their daughter)] in a more feasible place to live. And our goal was for him [(Calvin)] to pay on his IRS, while I take on the mortgage." Latrese also testified that the reason Calvin's name was not on the deed was because "he didn't have the credit," so she financed it herself "to preserve us this place to stay that we could afford." Latrese testified that she paid the mortgage while Calvin paid for household expenses and "helped with each other" when they needed to do so.

¶18. As noted, a September 2, 2021 appraisal of the Gautier home was received into evidence as exhibit 13. Latrese testified that the appraisal was obtained to get the value of the home. The appraisal set the home's value at $228,000.00. Latrese's Rule 8.05 financial declaration lists this property as the "[m]arital [h]ome" and lists it as being owned by Calvin and Latrese Aultman.

¶19.     Calvin also testified at the hearing.  As of the date of the hearing, Calvin was fifty-four years old and employed with Chevron U.S.A. Inc. as a maintenance worker, currently repairing trucks.  Calvin testified that he worked for Chevron for eighteen years, and before that, he was with Northrop Grumman for about thirteen years.  According to his Rule 8.05 financial declaration, Calvin's monthly gross income was $12,020.00, with a monthly net income of $8,318.00.  His living expenses totaled $5,544.00.  Calvin testified that he was also paying child support in the amount of $1,165.00, which also must be taken out of his monthly net income of $8,318.00.  Calvin listed the balance of his ESIP as $110,113.00 as of "3.10.2022."  He listed the amount of his Chevron retirement plan benefit as $268,081.

¶20.     Regarding the Gautier home, Calvin testified that as shown on his Rule 8.05 financial declaration, the home's present value was $230,000.  According to Calvin, when he and Latrese first began looking into buying the property in 2017, "it appraised for [$]160[,000,]" and "[j]ust last year it appraised for [$]230[,000]."  He testified that after they bought the property, "[w]e had to replace both air-conditioning units. We had to redo the whole bathroom—master bedroom, bathroom[,] and floor, install a lot of can lights throughout the house, except for the dining room area[,] and we replaced all of the bathroom cabinetry and the tiles."  Calvin's  Rule 8.05 financial declaration provides that the equity in the home was $81,500.00. Calvin confirmed during his direct examination that this amount was calculated by subtracting the existing mortgage balance of $67,000 from the appraised amount of $230,000 and dividing this amount in half to take into account his mother-in-law's other half

interest.

¶21. Calvin did not deny taking out the loans and making the withdrawals from his ESIP account, and these amounts are reflected in his Chevron ESIP statements that were admitted into evidence. When questioned by the chancellor about the $21,356.00 withdrawal in April 2021 and the $15,624.00 in July 2021, Calvin testified, "I used it [the money from these withdrawals] to help pay bills. I mean, I did other stuff too—as well, but she know exactly what I did." When the chancellor asked Calvin about the $100,000 withdrawal in April or June of 2020, Calvin testified that he "paid bills with it, too. I spent it on house stuff." The chancellor then asked Calvin about the $80,000 of the $100,000 that was put in a "Chevron account." Calvin testified, "We spent it. I probably spent more than her, but I paid most of the bills with that money, but I mostly deal with it in cash whenever I paid something so I didn't use my card as much."

¶22. Calvin's gambling records from the "Golden Nugget Biloxi Hotel and Casino," the "IP Casino Resort & Spa," and the "Palace Casino Resort" were admitted into evidence. Calvin testified that he goes to the casinos about once or twice a week, sometimes more, and he has been going to them "ever[] since [he and Latrese] met."

¶23. Calvin also testified about the contempt motions filed against him. According to Calvin, he was "pretty sure I paid a car note, but I can't remember," and regarding other bills, "the way that my finances is, . . . sometimes [payment] is a little late but it was paid, wasn't nothing cut off." Regarding his failure to pay a USAA insurance premium, Calvin said he tried to pay it but was denied access to the account "because [Latrese] had changed [the

9

password]." Calvin said he talked to Latrese's lawyer about it, and they worked out how he should make the payments.

¶24. After the parties rested, the chancellor held a discussion among himself, counsel, and the parties to discuss the value of Calvin's ESIP and Chevron Retirement Plan[4] and Latrese's PERS account. Regarding Calvin's ESIP, Latrese's counsel explained how he calculated the amount using the ESIP statements Calvin had produced and arrived at $105,701.02 using "February [4, 2022] as the demarcation date."[5] The chancellor specifically asked Calvin's counsel if he agreed with that amount, and Calvin's counsel responded, "Your Honor, I haven't run the calculation. I guess I have no reason to disagree based upon his [(Latrese's counsel's)] assertion as to how he calculated that."

¶25. Regarding Calvin's Chevron retirement plan, Calvin had told the chancellor in a November 29, 2022 conference that there was "like, [$]234[,000] in the pension." When the chancellor asked, "[W]hat record do we have on that[?]" Calvin's counsel referred the chancellor to collective exhibit 19 that included several statements showing the value of Calvin's expected retirement benefit on several different dates. No specific amount, however, was agreed upon on the record.

---

[4] At times, the chancellor and counsel referred to Calvin's ESIP as his "401(k)" account, but based upon our review of the transcript, it is clear that the chancellor and counsel knew any such reference was to Calvin's ESIP. Similarly, at times the chancellor and counsel referred to Calvin's pension or retirement plan benefit as his "annuity." Again, we find that based upon our review of the record, the chancellor and counsel understood that any such reference was to Calvin's pension or Chevron retirement plan.

[5] At the beginning of the hearing, an agreement had been reached to use March 10, 2022, as the demarcation date.

¶26. The chancellor also asked for documentation of Latrese's PERS account value. Latrese's counsel told the chancellor, "I do have that," but further discussion regarding the amount was held off the record.

¶27. On September 5, 2023, the chancellor entered the Judgment of Divorce. The chancellor recognized that "[t]he major assets to be divided in this case include individual retirement accounts, several vehicles, a home in which Latrese and the minor child reside [(the Gautier home), and] a three-acre tract of land [jointly owned by the parties]." The chancellor then conducted an equitable distribution analysis, first determining what property was marital and non-marital and then discussing each of the *Ferguson* factors with respect to the marital property.

¶28. In relevant part, the chancellor found that the Gautier home "appears to be a gift of inheritance to Latrese" and ruled that "the house Latrese owns with her mother is non-marital property." The chancellor found that the remaining assets were marital property.

¶29. Regarding the marital property consisting of the parties' retirement and investment accounts, the chancellor found that "[e]ffective July 21, 2022, Latrese's retirement account through PERS is $23,772.20," "Calvin's 40l(k) [(ESIP)] has a balance of $105,701.02," and Calvin's annuity [(retirement plan benefit)] [has] a value of $268,081.00."[6] The chancellor specifically ruled:

> Utilizing the *Ferguson* and *Armstrong* factors, the equitable division [of these marital assets] shall be as follows:

---

[6] The $268,081.00 amount is the amount stated on Calvin's Rule 8.05 financial declaration for his Chevron retirement plan benefit.

11

A. Calvin is awarded one-half value of Latrese's PERS retirement account, or the sum of $11,886.10; Calvin is credited with this amount as his retirement account is addressed hereinafter;

B. Calvin's 40l(k) has a balance of $105,701.02. Deducted from this value is Calvin's credit from Latrese's PERS account of $11,886.10; ($105,701.02 minus $11,886.10 equals $93,814.92); Latrese is awarded one-half of this net, or the sum of $46,907.46;

C. Calvin is awarded the balance of his 401(k);

D. Calvin and Latrese are awarded one-half (½) of Calvin's annuity with a value of $268,081.00 split equally between the [p]arties; and

. . . .

F. Calvin shall be responsible for the outstanding loans against his retirement accounts and the IRS tax debts. Calvin shall indemnify and hold Latrese harmless for the payment of same.

¶30. With respect to Latrese's request for alimony, the chancellor addressed each of the *Armstrong* factors and ruled that "Latrese is entitled to permanent periodic alimony until her death or remarriage in the sum of $1,000.00 per month."

¶31. The chancellor awarded Latrese $8,145.00 in attorney's fees. We address the chancellor's findings and rulings on this issue below.

¶32. On September 15, 2023, Calvin filed a motion for a new trial pursuant to Mississippi Rule of Civil Procedure 59, asserting, among other issues, that the chancellor erred in finding that the Gautier home was a "gift of inheritance to Latrese" and Latrese's separate property. Calvin also asserted that the chancellor underwent an improper *Armstrong* analysis and did not consider Latrese's "monthly income situation" in awarding Latrese $1,000 per month in periodic alimony to Latrese. Additionally, Calvin asserted that the chancellor's "award of

12

attorneys' fees to Latrese and/or her attorney [was] not supported by the findings."

¶33. The chancellor conducted a hearing on Calvin's Rule 59 motion on December 15, 2023. At the hearing, Calvin's counsel argued that the Gautier home was not a "gift of inheritance," but rather, pursuant to the "family use" doctrine,[7] Latrese's one-half interest in that property should be treated as marital property, and that interest should be split equally between Latrese and Calvin. Calvin further argued that periodic alimony in the amount of $1,000 per month was not warranted, and if alimony was assessed, then the value of the Gautier home should be considered.

¶34. In his Rule 59 motion, Calvin did not challenge or object to the amounts the chancellor used for Latrese's PERS retirement account or Calvin's ESIP or retirement plan benefit, nor did Calvin's counsel offer any argument challenging these amounts at Calvin's Rule 59 motion hearing.

¶35. On May 29, 2024, the chancery court entered an amended final judgment, granting in part and denying in part Calvin's Rule 59 motion. With respect to the Gautier home, the chancellor found that Latrese's one-half interest in the home was marital property and that Calvin was entitled to one-half of Latrese's interest in the Gautier home. In calculating the value of Calvin's interest, the chancellor specifically found that "[n]either party offered an appraisal or even opinions of this house's value." The chancellor, therefore, used the $70,000.00 Latrese and her mother borrowed to acquire and renovate the home as the home's

---

[7] Non-marital assets "may be converted into marital assets if they are . . . utilized for domestic purposes, absent an agreement to the contrary." *Cassell v. Cassell*, 389 So. 3d 305, 313 (¶21) (Miss. 2024) (quoting *Stewart v. Stewart*, 864 So. 2d 934, 937 (¶12) (Miss. 2003)).

value. After subtracting the outstanding $67,000 mortgage balance and determining the home's equity equaled $3,000, the chancellor apportioned one-half of Latrese's one-half interest to Calvin and found that "Calvin [had] an equitable interest in said house of $750.00." To avoid repetition, we discuss the chancellor's ruling in further detail below. Accordingly, the chancellor amended the equitable distribution in the September 5, 2023 Judgment of Divorce, as follows:

> To effect the amendment to the [c]ourt's prior equitable distribution in the Judgment of Divorce, Paragraph VIII, sub-paragraphs A and B of the September 5, 2023 Judgment of Divorce are amended as follows:
>
> A.     Calvin is awarded one-half of Latrese's PERS retirement account, or the sum of $11,885.10; Calvin is awarded one-half . . . of Latrese's equity in the house, or the sum of $750.00; Calvin is credited with these amounts as his retirement account is addressed hereinafter;
>
> B.     Calvin's 40l(k) has a balance of $105,701.02. Deducted from this value is Calvin's credit from Latrese's PERS account of $11,886.10 and Calvin's credit for equity in the house of $750.00 ($105,701.02 minus $11,886.10 minus $750.00 equals $93,064.92); Latrese is awarded one-half . . . of this net, or the sum of $46,532.46.
>
> All other portions of the Judgment of Divorce not amended herein and above remain in effect. . . .
>
> Any and all other relief requested by either party not specifically addressed herein is hereby DENIED.

¶36.   Calvin appealed.

## STANDARD OF REVIEW

¶37.   "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused [his] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Williams v. Williams*, 359 So. 3d 217,

14

220 (¶11) (Miss. Ct. App. 2023) (internal quotation mark omitted). "[A] reviewing court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." *Chism v. Chism*, 285 So. 3d 656, 661 (¶12) (Miss. Ct. App. 2019).

## DISCUSSION

### I. Equitable Distribution

¶38. Calvin asserts that the chancellor manifestly erred in his equitable distribution analysis because he did not properly value the Gautier home or the parties' retirement accounts. For the reasons addressed below, we find that the chancellor's apparently inadvertent failure to consider the Gautier home's appraised value resulted in manifest error in the chancellor's valuation of the home and the equitable distribution of this marital asset. We therefore reverse the chancellor's Final Judgment with respect to the valuation of the Gautier home and remand for the chancellor to reconsider the valuation and equitable distribution of that asset in accordance with our discussion below. Regarding the chancellor's valuation of Calvin's ESIP and retirement fund accounts and Latrese's PERS account, we find that Calvin has waived this issue on appeal. We also find that Calvin's assertions on this point are without merit.

¶39. "To equitably divide property, chancellors must: (1) classify the parties' assets and liabilities as marital or separate, (2) determine the value of the property, and (3) divide the marital property equitably." *Warner v. Warner*, 341 So. 3d 152, 159-60 (¶22) (Miss. Ct. App. 2022). "Assets which are classified as non-marital, such as inheritances, may be

15

converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary." *Cassell*, 389 So. 3d at 313 (¶21); *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶19) (Miss. 2002) ("Property brought into the marriage by one partner and used by the family becomes a marital asset.").

### A. The Gautier Home

¶40. Calvin asserts that the chancellor failed to properly value the Gautier home because he omitted the home's appraised value in his calculation, thus resulting in manifest error in the court's equitable distribution of the marital property. We agree for the reasons set forth below.

¶41. To review, in the September 2023 Judgment of Divorce, the chancellor found that the Gautier home was one of the "major assets" to be addressed[8] and concluded that the home "appears to be a gift of inheritance to Latrese," and, therefore, "the house Latrese owns with her mother is non-marital property."

¶42. After consideration of Calvin's Rule 59 motion, however, the chancellor issued an amended judgment in May 2024, finding that Latrese's one-half interest in the Gautier home was marital property, as follows:

> The proof at trial showed this house was purchased four . . . years prior to this divorce action being filed. Latrese and her mother borrowed $70,000.00 during Latrese's marriage to Calvin. For four . . . years, Calvin, Latrese, their

---

[8] The chancellor found that the other "major assets to be divided in this case include[d] individual retirement accounts, several vehicles, [and] a three-acre tract of land [jointly owned by the parties]." The chancellor valued the parties' accounts as set forth above, awarded Latrese one-half of Calvin's ESIP and one-half of Calvin's retirement account, and awarded Calvin one-half of Latrese's PERS account. The jointly held three-acre tract of land was equally divided between the parties.

16

child and Latrese's mother occupied this house as the familial home. This continued use, prior to the divorce proceedings, establishes this house is subject to family use and no longer considered an asset of separate property. As such, Latrese's [one-half] interest in this house is subject to equitable distribution.

Neither Calvin nor Latrese challenges this determination.

¶43. With respect to the second step of the requisite analysis, the chancellor found that Calvin was entitled to one-half of Latrese's interest in the Gautier home, calculating this interest as follows:

> *Neither party offered an appraisal or even opinions of this house's value.* The only mention of value was the $70,000.00 loan taken out by Latrese and her mother. $35,000.00 was paid to Latrese's step-father when he and Latrese's mother divorced. The remaining $35,000.00 was put into renovations of this older house. The Court concludes the house had a value of $70,000.00. Four . . . years later, the $70,000.00 mortgage had a payoff of $67,000.00. This gives $3,000.00 in equity in said house. One-half . . . of this equity belongs to Latrese's mother and the remaining one-half . . . belongs to Latrese. Latrese's $1,500.00 should be equally divided between Latrese and Calvin, thus rendering Calvin an equitable interest in said house of $750.00.

(Emphasis added).

¶44. As the italicized sentence above indicates, the chancellor found that "[n]either party offered an appraisal or even opinions" pertaining to the value of the Gautier home. This finding was in error because an appraisal of the home was received into evidence, and the parties both testified about the value of the home. Exhibit 13, which contained the September 2, 2021 appraisal of the Gautier home, was received into evidence by stipulation at the beginning of the June 23, 2023 hearing. The appraisal valued the Gautier home at $228,000.

¶45. Additionally, Latrese testified that the appraisal was obtained to get the value of the

17

home and that she purchased her stepfather's interest in the Gautier home "to get us [(Latrese, Calvin, and their daughter)] in a more feasible place to live." Latrese said she paid the mortgage, while Calvin paid for household expenses, and "we helped with each other" when they needed to do so. Further, Latrese's Rule 8.05 financial declaration (exhibit 2) lists this property as the "[m]arital [h]ome" and as being owned by Calvin and Latrese Aultman. Calvin also testified at the June 2023 hearing about the home's value, stating that the home's present value was $230,000. This value was also listed on Calvin's Rule 8.05 financial declaration. Although we recognize that Calvin and Latrese offered different opinions on the home's value and the amount each contributed to renovations to the home after it was purchased, we find that this does not overcome the fact that the chancellor did not consider the appraised value at all, based on his *stated belief* that no evidence or testimony had been offered on that value.

¶46. In addressing this issue, we recognize that, generally speaking, "[w]hen a chancellor makes a valuation judgment based on proof that is less than ideal, it will be upheld as long as there is some evidence to support [his] conclusion." *Warner*, 341 So. 3d at 161 (¶26). However, we find that the chancellor's specific (but incorrect) finding that there was *no* appraisal or opinion on the Gautier home's value creates an exception to this general rule and supports our determination that the chancellor's valuation of the home in this case was in error.

¶47. Latrese points out that a chancellor's valuation of the marital home has been affirmed where the chancellor used other evidence in the record and gave little, if any, weight to the

18

home's appraised value. Thus, according to Latrese, there was no error in the chancellor failing to consider the Gautier home's appraised value or other evidence of its value. We find this assertion without merit because the cases Latrese relies upon are wholly distinguishable.

¶48. In *Byrd*, for example, the chancellor was presented with figures for the 2006 purchase price of the marital home and the 2011 appraisal value. *Byrd v. Byrd*, 100 So. 3d 443, 449 (¶16) (Miss. 2012). The supreme court found no abuse of discretion in the chancellor choosing the marital home's 2006 purchase price over its appraised value in valuing the property based upon the chancellor's factual findings in that case. *Id.* In *Arrington*, this Court found no abuse of discretion in the chancellor giving minimal consideration to the marital home's appraised value in valuing it for alimony purposes, in light of the possibility that it may not sell at that value. *Arrington v. Arrington*, 80 So. 3d 160, 166 (¶21) (Miss. Ct. App. 2012).

¶49. In both *Byrd* and *Arrington*, however, the chancellor made a conscious decision to choose evidence other than an appraisal to support the chancellor's valuation analysis. In contrast, the chancellor here made a point of stating that *no* appraisal or testimony about the home's value had been presented, indicating to this Court that *if* the chancellor had realized this evidence was before him, he would have considered it. We also find it relevant that the Gautier home's $228,000 appraised value is over three times greater than the $70,000 original mortgage amount used by the chancellor as the home's value. Using this value, the

19

chancellor calculated Calvin's equitable interest as $750.[9] Had the chancellor considered the home's $228,000 appraised value, the possibility exists that Calvin could have been awarded an equitable interest in the home of $40,250, rather than $750.[10] We find that this difference is significant.

¶50. In sum, we find that these circumstances, considered as a whole, resulted in manifest error. *See Warner*, 341 So. 3d at 162 (¶29) (reversing chancellor's division of property and remanding for re-evaluation, finding, among other reasons, that the chancellor erred in valuing the parties' vehicle at $3,000; although wife testified it was "probably worth $3,000," other information, including a valuation sheet and the parties' financial disclosures, indicated the vehicle's value was between $4,750 and $6,575).

¶51. Accordingly, we reverse the chancellor's Final Judgment on this point and remand for the chancellor to reconsider the valuation and equitable distribution of the Gautier home in light of the appraisal and in addition to the other testimony and evidence before the court. In so ruling, however, we point out that "[e]quitable distribution does not require equal distribution. Rather, equitable distribution is a fair division of marital assets during the marriage." *Chapman v. Chapman*, 395 So. 3d 447, 456 (¶26) (Miss. Ct. App. 2024) (citation

---

[9] Taking into account the $67,000 remaining balance on the mortgage four years later, the chancellor subtracted this amount from $70,000 and determined that the home's equity value was $3,000. The chancellor then ruled that Latrese's one-half interest in the home's equity ($1,500) "should be equally divided between Latrese and Calvin, thus rendering Calvin an equitable interest in said house of $750."

[10] Using the $228,000 appraised value, the equity in the home would equal $161,000 ($228,000 - $67,000), with Latrese's one-half interest equaling $80,500 and Calvin's one-half interest in that amount equaling $40,250.

and internal quotation marks omitted). Thus, in determining the equitable division of the equity in the home, the chancellor is free to consider all evidence before him, including the parties' testimonies concerning their respective contributions to the renovations or improvements made to the home after its purchase through March 10, 2022, the date of demarcation.

### B. Valuation of Calvin's Chevron ESIP and Retirement Plan Benefit and Latrese's PERS Account

¶52. Calvin asserts that the chancellor erred in valuing the parties' retirement accounts. We find that Calvin failed to object and has waived this issue on appeal. Even if Calvin had not waived this issue, we further find that Calvin's assertions on this point are without merit.

¶53. Like the Gautier home, the chancellor also found that Calvin's ESIP and Chevron retirement plan benefit and Latrese's PERS account were "major assets" to be divided. In valuing these assets, the chancellor found that "[e]ffective July 21, 2022, Latrese's retirement account through PERS is $23,772.20"; "Calvin's 40l(k) [(ESIP)] has a balance of $105,701.02"; and "Calvin's annuity [(retirement plan benefit)] [has] a value of $268,081.00." The chancellor awarded Calvin one-half the value of Latrese's PERS account and awarded Latrese one-half the value of Calvin's ESIP and retirement plan benefit.

¶54. Until this appeal, Calvin never objected to these values or the supporting documentation during any valuation discussion at the June 23, 2023 hearing. Further, when these amounts were specifically set forth in the September 2023 Judgment of Divorce, Calvin made no objection to these amounts in his Rule 59 motion or at the hearing on that motion. Therefore, Calvin has waived any assignment of error with respect to these values on appeal.

21

*Weatherly v. Weatherly*, 412 So. 3d 276, 297 (¶45) (Miss. Ct. App. 2024) (finding husband waived issue regarding valuation of wife's retirement account where "[the wife's] Rule 8.05 financial statement [stating this amount], as well as her testimony regarding the premarital value of the account, were admitted without objection"), *cert. dismissed*, 416 So. 3d 102 (Miss. 2025).

¶55.    In any event, we find no manifest error in the chancellor's valuation amounts with respect to each account. Regarding the ESIP amount, at the June 23, 2023 hearing, Latrese's counsel explained to the chancellor and Calvin's counsel how he calculated the $105,701.02 amount based on Calvin's ESIP statements that had been received into evidence. The chancellor then specifically asked Calvin whether he agreed with that amount. Calvin's counsel replied, "Your Honor, I haven't run the calculation. I guess I have no reason to disagree based upon his [Latrese's counsel's] assertion as to how he calculated that." In short, the evidence supports the chancellor's ESIP valuation—and Calvin acknowledged as much on the record.

¶56.    Regarding Calvin's retirement plan valuation, the chancellor obtained the $268,081.00 valuation amount from Calvin's own Rule 8.05 financial declaration. Calvin asserts that this was not the value of his retirement plan benefit as of March 10, 2022 (the demarcation date), but he offered no method for calculating a different amount at the June 23, 2023 hearing or at any other time, despite the chancellor's request for this information. "[I]t is incumbent upon the parties, not the chancellor, to prepare the evidence needed to clearly make a valuation judgment." *Warner*, 341 So. 3d at 161 (¶26). Calvin failed to do so here.

¶57.    Regarding the $23,772.20 value for Latrese's PERS account, Calvin asserts that there is no proof in the record of the account's value on the date of demarcation.  At the June 23, 2023 hearing, however, Latrese testified that her PERS account was valued at "like, [$]22,000-and-something," and Latrese's counsel provided further documentation regarding that value. Further discussion on that issue, however, was held off the record.  As we have already recognized, a chancellor's valuation judgment "will be upheld as long as there is some evidence to support his conclusion," even if that proof "is less than ideal." *Id.*  In any event, it was Calvin's responsibility to preserve the PERS discussion on the record and any objection he had to the valuation, but he did not do so.  "This Court may not act upon or consider matters which do not appear in the record." *Pace v. Pace*, 324 So. 3d 369, 381 (¶39) (Miss. Ct. App. 2021).

¶58.    For all these reasons, we find that Calvin waived his assignment of error based upon the chancellor's retirement account valuations.  Further, even if Calvin had preserved this assignment of error, we find it is without merit.

## II.    Alimony

¶59.    Following the equitable distribution of the marital property pursuant to *Ferguson*, the chancellor considered Latrese's request for alimony.  After considering the *Armstrong* factors, the chancellor awarded Latrese "permanent periodic alimony until her death or remarriage in the sum of $1,000.00 per month."  Calvin asserts that the chancellor's alimony award must be reconsidered because the chancellor's equitable distribution analysis was in error.  We agree for the reasons addressed below.

23

¶60.   "Alimony is considered *only after the marital property has been equitably divided* and the chancellor determines one spouse has suffered a deficit." *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003) (emphasis added); *Chapman*, 395 So. 3d at 456 (¶26) (Following the equitable division of the marital estate, the chancellor must "consider the appropriateness of alimony if either party is left with a deficiency."). Thus, it follows that "when a case is remanded for further consideration of the division of the marital assets," as here, "this Court must also remand on the issue of alimony as the proper distribution of the parties' assets and debts may affect the amount of alimony ultimately awarded." *Williams v. Williams*, 303 So. 3d 824, 835 (¶41) (Miss. Ct. App. 2020).

¶61.   As the supreme court has long recognized, remand is necessary because "[a]ll property division, [including] lump sum or periodic alimony payment . . . should be considered together. Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." *Ferguson*, 639 So. 2d at 929. "[A]limony and equitable distribution should be considered together so as to prevent inequity." *Watson v. Watson*, 882 So. 2d 95, 98 (¶15) (Miss. 2004). "In the final analysis, all awards should be considered together to determine that they are equitable and fair." *Id.* (quoting *Ferguson*, 639 So. 2d at 929).

¶62.   In *Lauro*, for example, the supreme court explicitly held that where the wife was granted "permanent periodic alimony," as in the case before us, "case law mandates that her award of alimony be considered together with the equitable distribution of the marital property." *Lauro*, 847 So. 2d at 849 (¶15). Thus, where the supreme court determined that

24

the chancellor erred in dividing the couple's marital property, the supreme court further instructed the chancellor that "[u]pon remand, the chancellor must reconsider not only the issue of equitable distribution, but also the awards of alimony and child support after he has properly divided the marital assets." *Id.* at 848 (¶12).

¶63. The same principle applies when a chancellor is found to have erred in valuing a particular marital asset, as here. In *Mace*, for example, the supreme court affirmed the chancellor's inclusion of Dr. Mace's medical practice as a marital asset but reversed the chancellor's valuation of that asset. *Mace v. Mace*, 818 So. 2d 1130, 1134 (¶16) (Miss. 2002). Accordingly, the supreme court remanded the case "for an adequate valuation of the practice" and likewise vacated the chancellor's alimony award, instructing the chancellor "to revisit the [alimony] issue[,] as alimony and equitable distribution should be considered together." *Id.*; *accord Warner*, 341 So. 3d at 165 (¶39) (reversing the chancellor's equitable distribution ruling and remanding for reconsideration of that issue as well as the chancellor's permanent alimony award); *Williams*, 303 So. 3d at 835 (¶41) (determining that "[b]ecause we reverse and remand the chancellor's equitable distribution of the marital estate, we also reverse [the wife's periodic] alimony award and remand . . . for further consideration on these issues"); *Carter v. Carter*, 98 So. 3d 1109, 1114 (¶18) (Miss. Ct. App. 2012) ("The change in one financial award or obligation changes the entire field of the financial settlement in a divorce judgment." (internal quotation marks omitted)).

¶64. In the case before us, we reverse the chancellor's equitable-distribution ruling with respect to the valuation of the Gautier home and instruct the chancellor on remand to

reconsider the valuation and equitable distribution of this "major asset" in light of the 2021 appraisal and all other evidence and testimony concerning the home's value and the parties' respective contributions to the equity in the home. Because we are reversing part of the chancellor's valuation and equitable distribution of the marital property, we must also reverse Latrese's permanent periodic alimony award so that the chancellor may revisit this issue on remand, "as alimony and equitable distribution should be considered together." *Mace*, 818 So. 2d at 1134 (¶16).

### III. Attorney's Fees

¶65. Calvin asserts that the chancellor's award of attorney's fees to Latrese in the amount of $8,145.00 should be reversed because the chancellor did not state whether the fees were awarded with respect to the divorce proceeding, contempt proceedings, or both. Calvin further asserts that in awarding the fees, the chancellor erred because he made no findings regarding Latrese's inability to pay or regarding any of the *McKee* factors.[11] For the reasons addressed below, we affirm the chancellor's attorney's fees award to Latrese relating to the contempt proceedings. We reverse the ruling as to the amount of this award, however, and remand and instruct the chancellor to determine the proper amount attributable to the contempt proceedings consistent with our discussion below. We further instruct the chancellor that on remand, he may also consider, in his discretion and consistent with the authorities we address below, whether an attorney's fees award to Latrese relating to the

---

[11] *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982). As we address in further detail below, in *McKee*, "the Mississippi Supreme Court established several factors to determine the proper amount of attorney's fees to award in domestic cases." *Chism*, 285 So. 3d at 667 (¶39).

26

divorce proceeding is appropriate. If the chancellor finds that such an award is appropriate, we instruct the chancellor to use the *McKee* factors in determining the proper amount of attorney's fees and further consider the amount of this award in light of the changes, if any, in the equitable distribution of the marital property.

¶66. "The award of attorney fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards." *Shumake v. Shumake*, 233 So. 3d 234, 240 (¶20) (Miss. 2017). "As the issue of whether to award attorney's fees in a divorce case is a discretionary matter left to the chancellor, this Court is reluctant to disturb such a finding." *Stewart v. Stewart*, 2 So. 3d 770, 776 (¶18) (Miss. Ct. App. 2009) (internal quotation marks omitted); *see Wallace v. Wallace*, 336 So. 3d 1151, 1159 (¶22) (Miss. Ct. App. 2022) (applying an abuse of discretion standard of review in addressing chancellor's award of attorney's fees to wife where husband found in contempt for failure to comply with terms of couple's marital dissolution agreement).

¶67. There are different standards for awarding attorney's fees in a divorce proceeding and a contempt proceeding. *Shumake*, 233 So. 3d at 241 (¶22). "In assessing an award of attorney's fees, the chancery court [must] first determine[] the type of action brought and then use[] the appropriate method for a calculation of any attorney's fees to award." *Krohn v. Krohn*, 294 So. 3d 680, 688 (¶20) (Miss. Ct. App. 2020); *In re C.T.*, 228 So. 3d 311, 318 (¶21) (Miss. Ct. App. 2017) (recognizing that in awarding attorney's fees, "the chancellor explicitly stated that the attorney's fees were not awarded in relation to the modification proceeding but the contempt action").

¶68. In proceedings relating to the divorce action, an award of attorney's fees is based in part upon the requesting party's inability to pay. *Stewart*, 2 So. 3d at 776 (¶18). "Where the record shows an inability to pay and a disparity in the relative financial positions of the parties, there is no error in awarding attorney fees." *Shumake*, 233 So. 3d at 240 (¶20).

¶69. With respect to determining the amount to award, it "should be only in such amount as will compensate for the services rendered. It must be fair and just to all concerned after it has been determined that the legal work being compensated was reasonably required and necessary." *McKee*, 418 So. 2d at 767. Our caselaw shows that in *McKee*, the supreme court established several factors to guide the court in this analysis, as follows:

> (1) relative financial ability of the parties; (2) the skill and standing of the attorney employed, (3) novelty and difficulty of issues in the case, (4) the responsibility required in managing the case, (5) time and labor required, (6) the usual and customary charge in the community, and (7) whether the attorney was precluded from undertaking other employment by accepting the case.

*Krohn*, 294 So. 3d at 689 (¶21) (quoting *Baumbach v. Baumbach*, 242 So. 3d 193, 208-09 (¶54) (Miss. Ct. App. 2018) (Fair, J., concurring in part and dissenting in part)).

¶70. Regarding attorney's fees relating to contempt proceedings, "[w]hen a party is held in contempt for violating a valid judgment of the court, then attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Wallace*, 336 So. 3d at 1159 (¶22). Upon the chancellor's finding "a party in willful contempt of court orders, this Court has found that the record sufficiently supports the chancellor's award of attorney's fees to the moving party." *Dixon v. Olmstead*, 296 So. 3d 227, 235 (¶35) (Miss. Ct. App. 2020). "[I]t is not necessary to establish the *McKee* factors

in a contempt action," *In re C.T.*, 228 So. 3d at 319 (¶21), nor is "a specific finding of inability to pay . . . required when attorney's fees are assessed against a party found to be in contempt." *Dixon*, 296 So. 3d at 235 (¶34). Nevertheless, "the ultimate award of attorney's fees must still be within reason." *Id.*

¶71. An attorney's fees award in the contempt context "should not exceed the expense incurred as a result of the contemptuous conduct." *Id.* at (¶33). Thus, "fees incurred litigating other matters [relating to the divorce proceeding] are not recoverable based on the contempt." *Id.*; *see also Krohn*, 294 So. 3d at 689-90 (¶¶25-26). Further, in determining the proper amount of attorney's fees to award in the contempt context,

> the court shall not require the party seeking such fees to put on proof as to the reasonableness of the amount sought, but shall make the award based on the information already before it and the court's own opinion based on experience and observation; provided however, a party may, in its discretion, place before the court other evidence as to the reasonableness of the amount of the award, and the court may consider such evidence in making the award.

*In re C.T.*, 228 So. 3d at 319 (¶21) (quoting Miss. Code Ann. § 9-1-41 (Rev. 2014));[12] *see also Stephens v. Stephens*, 328 So. 3d 760, 772 (¶39) (Miss. Ct. App. 2021); *Krohn*, 294 So. 3d at 688 (¶20).

¶72. A chancellor's failure to specifically identify "the type of action[s] brought and then use[] the appropriate method for a calculation of any attorney's fees to award," *Krohn*, 294 So. 3d at 688 (¶20), will ordinarily result in reversal and remand on at least one aspect of the attorney's fees issue. *See Shumake*, 233 So. 3d at 241 (¶22); *Krohn*, 294 So. 3d at 690 (¶26).

¶73. *Shumake*, for example, involved both the wife's complaint for citation of contempt

_____

[12] There has been no change to section 9-1-41 since it was enacted in 1990.

29

and the husband's counter-claim for alimony modification. *Shumake*, 233 So. 3d at 236 (¶3). The supreme court affirmed the chancellor's attorney's fees award to the wife based on her successful contempt action, but "[g]iven the differing standards for awarding attorney fees in a contempt action and in a modification action," the supreme court reversed the amount awarded because the chancellor did not subtract the attorney's fees attributable to defending the modification proceeding. *Id.* at 241 (¶22). For this reason, the supreme court remanded the case for the chancellor to determine the amount attributable to the contempt proceedings. *Id.*

¶74. Additionally, the supreme court expressly noted that on remand, "the chancellor, in his discretion, may [also] award Ms. Shumake attorney fees for defending the modification action should he find an inability to pay on Ms. Shumake's part and relative financial disparity between the parties." *Id.*; *see Krohn*, 294 So. 3d at 690 (¶26) (reversing attorney's fees award and remanding "for proper determination of the amount of attorney's fees attributable to the [successful] contempt actions and the amount of attorney's fees owed, if any, for the other matters").

¶75. In this case, the chancellor properly identified the two separate proceedings for which Latrese sought attorney's fees, as follows: "Latrese seeks an award of attorney fees for bringing this divorce action as well as the three contempt actions she filed." Despite *recognizing* that Latrese sought attorney's fees for both the divorce and contempt proceedings, however, the chancellor appears to have awarded attorney's fees to Latrese based only on her successful contempt proceedings, as follows:

MEC #76 is an order finding Calvin in contempt. A wage withholding order was then enrolled for the collection of financial support to Latrese and the minor child. Throughout this time, Calvin has been and he remains an able-bodied man who was gainfully employed. Calvin wholly failed to justify his actions of non-compliance with the orders of this Court. Having previously been found in contempt, Calvin is responsible to and shall pay Latrese's attorney, Hon. Matthew Lott, the sum of $8,145.00.

In support of this ruling, the chancellor found:

Since filing her Complaint for Divorce (MEC #2) in February 2022, the Court has entered nine (9) Temporary Orders. The majority of these temporary orders have dealt with contempt allegations for Calvin's delayed or non-payment of support. Due to Calvin's misunderstanding, uncertainty, or an unwillingness to comply with the support obligations, a Withholding Order was issued December 30, 2022 (MEC #80) to collect support payments from Calvin's employer and pay directly to Latrese. The frequency of Court proceedings declined after entry of that Withholding Order. . . .

It was only after a Withholding Order was entered to collect the monthly obligations of Calvin which finally gave Latrese the assurance of receiving financial support.

¶76. We find that the chancellor's findings relating to the award of attorney's fees for Latrese's successful contempt proceedings are amply supported by the record. As we have detailed above, Latrese was required to repeatedly go before the chancellor to compel Calvin to pay his support obligations pursuant to the March 10, 2022 temporary order, and her requests were supported by proof of outstanding bills and Calvin's failure to pay them. In the second temporary order dated December 14, 2022, the chancellor specifically found that Calvin was "in willful contempt for failure to pay items in [the March 10, 2022] temporary order" and specifically reserved the issue of "[a]ttorney's fees and incarceration." Indeed, the chancellor's finding of Calvin's repeated "willful contempt" of his obligations under the temporary order, alone, "sufficiently supports the chancellor's award of attorney's fees to the

31

moving party." *Dixon*, 296 So. 3d at 235 (¶35). As such, we affirm the chancellor's decision to award Latrese attorney's fees for her successful contempt proceedings.

¶77. Upon review of the record, however, we find that the $8,145.00 amount awarded to Latrese for Calvin's willful contempt is primarily attributable to the divorce proceedings. As reflected in the following table, Latrese's attorney submitted several invoices supporting Latrese's attorney's fees request that total $8,145.00. These invoices, however, contain no reference to time spent for the contempt proceedings:

| Inv. No. | Due Date | Amount Due | Description |
|----------|----------|------------|-------------|
| 1742 | 12-3-21 | $5,000.00 | "Divorce" "Flat rate" |
| 2009 | 6-22-22 | $1,400.00 | [no description] |
| 01081 | 2-4-22 | $ 45.00<br>$1,500.00<br>$ 200.00 | "process server fee"<br>"Discovery fee"<br>"reimbursable expenses" |

¶78. Further, at the June 23, 2023 hearing, Latrese's attorney told the chancellor that "[w]e are requesting our attorney's fees in full. [Latrese] makes very little income on her own, and she is not able to afford . . . [it from] that income." The following exchange then took place, demonstrating that the $8,145.00 invoiced amount did not reflect any fees incurred for the contempt proceedings:

> THE COURT: What amount are you seeking in attorney's fees?
>
> [LATRESE'S
> COUNSEL]: It's—my total bill is about eight thousand one hundred and, I think, it's fifty dollars . . . *but that does not include—that's just what I've billed her, Judge. We've come back here on numerous contempt motions to make him pay—*

32

| THE COURT: | Right. |
|---|---|
| [LATRESE'S COUNSEL]: | *[A]nd so we would want further compensation of, at least, $1,500 per hearing for having to come into this court*, which I have not billed her, and quite honestly, she can't afford it and she doesn't need to pay it, *so we're asking for further fees based on the numerous contempts that we have had to file*. |

(Emphasis added). Given the lack of clarity in the basis for the amount of attorney's fees awarded, we reverse the *amount* awarded and remand this case to allow the chancellor to determine the amount of attorney's fees attributable to the contempt proceedings consistent with the authorities we have set forth above.

¶79. Regarding Latrese's request for attorney's fees relating to the divorce proceeding, we find that the chancellor did not make any specific findings *in the attorney's fees context* regarding Latrese's inability to pay or the financial disparity between the parties. The chancellor did address, however, the parties' financial situations in discussing other issues in the judgment. Namely, the chancellor found that "Latrese's 8.05 reflects gross income of $2,247.27, with a net monthly pay of $1,455.27. Latrese's monthly obligations exceed $5,000.00," and that "Calvin's 8.05 reflects a gross monthly wage of $12,020.00, with net monthly income of $8,318.00. His 8.05 financial statement reflects a payment toward rent, vehicle notes, as well as a $905.00 contribution to retirement. His monthly income exceeds his expenses by $3,000.00."

¶80. Under these circumstances, we find that on remand, the chancellor, in his discretion, may also award Latrese attorney's fees relating to the divorce proceeding "should he find an

33

inability to pay on [Latrese's] part and relative financial disparity between the parties." *Shumake*, 233 So. 3d at 241 (¶22). If the chancellor determines that attorney's fees for the divorce proceeding should be awarded, he should utilize the *McKee* factors in determining the proper amount of such award. Additionally, because we have reversed this case for the chancellor to reconsider equitable distribution of the marital assets, we likewise instruct that on remand, the chancellor reconsider any award of attorney's fees relating to the divorce proceeding, if necessary, after proper division of the marital property. *See Lauro*, 847 So. 2d at 850 (¶18) (recognizing that "[e]quitable distribution is the first step in all divorce matters; therefore, . . . this case is [also] remanded so that the chancellor may revisit the award of attorney's fees, if necessary, after he has properly divided the marital property and awarded child support and alimony"); *see Clark v. Clark*, 43 So. 3d 496, 502 (¶25) (Miss. Ct. App. 2010) (recognizing that in *Lauro*, "the supreme court held reversal of a chancellor's distribution of property also required reversal of the chancellor's award of attorney's fees").

## CONCLUSION

¶81. In sum, we reverse the chancellor's Final Judgment with respect to the valuation of the Gautier home and remand for the chancellor to reconsider the valuation and equitable distribution of that asset consistent with this opinion. We affirm the chancellor's valuation of Calvin's ESIP and retirement fund accounts and Latrese's PERS account for the reasons addressed above.

¶82. Because we find that the chancellor's valuation and equitable-distribution analysis were in error with respect to the Gautier home, we find that the chancellor's alimony award

must also be reconsidered on remand in light of the changes, if any, to the equitable distribution of the marital property.

¶83. With respect to the attorney's fees award to Latrese, we affirm the chancellor's decision to award Latrese attorney's fees relating to the successful contempt proceedings. We reverse the amount of this award, however, and remand to allow the chancellor to determine the amount of these fees attributable to the contempt proceedings. On remand, the chancellor, in his discretion, may also consider whether Latrese is entitled to attorney's fees relating to the divorce proceeding, and, if so, we instruct the chancellor that in determining the amount of any such award, he is to use the *McKee* factors and further consider the changes, if any, in the equitable distribution of the marital property.

¶84. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LASSITTER ST. PÉ, J., NOT PARTICIPATING.**